Opinions of the Colorado Supreme Court are available to the public and can be accessed through the Judicial Branch's homepage at http://www.courts.state.co.us. Opinions are also posted on the Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE

**2021 CO 3**

**No. 19SC1004, *In re Marriage of LaFleur & Pyfer*—Common Law Marriage—Void Ab Initio—Retroactivity.**

The supreme court reviews whether a common law same-sex marriage entered in Colorado may be recognized as predating Colorado's recognition of formal same-sex marriages. The court holds that state law restrictions on same-sex marriage deemed unconstitutional in *Obergefell v. Hodges*, 576 U.S. 664 (2015), cannot serve as an impediment to the recognition of a same-sex marriage predating that decision. The court therefore affirms the district court's conclusion that the parties here were not, as a matter of law, barred from entering into a common law marriage. The court also affirms the district court's determination that the parties in fact entered into a common law marriage in 2003. The court reverses the district court's division of property and award of spousal maintenance, however, and remands with instructions to make further findings in accordance with sections 14-10-113 and -114, C.R.S. (2020).

## The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

**2021 CO 3**

**Supreme Court Case No. 19SC1004**

*C.A.R. 50 Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 18CA2252
Jefferson County District Court Case No. 18DR30057
Honorable Margie L. Enquist, Judge

**In re the Marriage of**

**Petitioner:**

Dean LaFleur,

v.

**Respondent:**

Timothy Pyfer.

**Judgment Affirmed in Part and Reversed in Part**
*en banc*
January 11, 2021

**Attorneys for Petitioner:**
Antolinez Miller, LLC
Joseph H. Antolinez
Melissa E. Miller
 *Centennial, Colorado*

Azizpour Donnelly, LLC
Katayoun A. Donnelly
 *Denver, Colorado*

**Attorneys for Respondent:**
Law Offices of Rodger C. Daley
Rodger C. Daley
Carrie Vonachen
Dorian Geisler
    *Denver, Colorado*

Reilly LLP
John M. McHugh
    *Denver, Colorado*

**Attorneys for Amici Curiae the Colorado LGBT Bar Association; the Colorado Women's Bar Association; Lambda Legal Defense and Education Fund, Inc.; and the National Center for Lesbian Rights:**
Lambda Legal Defense and Education Fund, Inc.
Shelly L. Skeen
    *Dallas, Texas*

Hogan Lovells US LLP
Mark D. Gibson
    *Denver, Colorado*

**JUSTICE MÁRQUEZ** delivered the Opinion of the Court.
**CHIEF JUSTICE BOATRIGHT** concurs in part and concurs in the judgment.
**JUSTICE SAMOUR** dissents.

¶1    In 2018, Respondent Timothy Pyfer filed a dissolution of marriage petition, alleging that he had entered into a common law marriage with his same-sex partner, Petitioner Dean LaFleur, when they held a ceremony before family and friends on November 30, 2003, and exchanged vows and rings. LaFleur countered that Pyfer's claim was legally impossible because at the time of the 2003 ceremony, Colorado did not recognize same-sex marriages. In the interim, however, the U.S. Supreme Court held that same-sex couples may exercise the fundamental right to marry and struck down state laws that excluded same-sex couples from civil marriage as unconstitutional. *Obergefell v. Hodges*, 576 U.S. 644, 674–75 (2015). We accepted jurisdiction over this case under C.A.R. 50 to address whether, in light of *Obergefell*, a same-sex couple may prove a common law marriage entered in Colorado *before* the state recognized same-sex couples' fundamental right to marry.

¶2    This case is one of three we announce today addressing common law marriage in Colorado. *See In re Marriage of Hogsett & Neale*, 2021 CO 1, __ P.3d __; *In re Estate of Yudkin*, 2021 CO 2, __ P.3d __. In *Hogsett,* we refine the test for establishing a common law marriage first articulated in *People v. Lucero*, 747 P.2d 660 (Colo. 1987), to reflect changed circumstances since that decision, including the recognition of same-sex marriage. Like this case, *Hogsett* involves a same-sex relationship predating *Obergefell*. But this case raises a threshold question that no

3

party contested in *Hogsett*: whether a same-sex couple may be deemed to have entered into a common law marriage pre-*Obergefell*.[1]

¶3 We hold that a court may recognize a common law same-sex marriage entered in Colorado before the state recognized same-sex couples' fundamental right to marry. We reach this conclusion for two reasons.

¶4 First, as stated, *Obergefell* struck down state laws that excluded same-sex couples from civil marriage as unconstitutional. 576 U.S. at 674–75. The general rule is that a statute that is declared unconstitutional is void ab initio; it is inoperative as if it had never been enacted. Consequently, state law restrictions held unconstitutional in *Obergefell* cannot serve as an impediment to the recognition of a same-sex marriage predating that decision. Indeed, recognition of a same-sex marriage is the remedy for a state's earlier violation of the couple's constitutional rights. Moreover, because *Obergefell* held that states must allow same-sex couples to enter marriages on the same terms and conditions as different-sex couples, and because Colorado recognizes common law marriages between

---

[1] As discussed in this opinion, *infra* ¶¶ 30–31, Colorado recognized same-sex marriage approximately eight months before *Obergefell* did so nationwide. We nevertheless use the phrase "pre-*Obergefell*" in this opinion as shorthand to refer generally to the time predating states' (including Colorado's) recognition of same-sex couples' fundamental right to marry.

4

different-sex couples, it therefore must also recognize such marriages between same-sex couples—including those entered into pre-*Obergefell*. Of course, to be recognized as a bona fide common law marriage, the relationship must satisfy the updated test we articulate today in *Hogsett*. ¶ 49 ("[A] common law marriage may be established by the mutual consent or agreement of the couple to enter the legal and social institution of marriage, followed by conduct manifesting that mutual agreement. The key question is whether the parties mutually intended to enter a *marital* relationship—that is, to share a life together as spouses in a committed, intimate relationship of mutual support and mutual obligation.").

¶5   Second, to the extent *Obergefell* did not merely recognize an existing fundamental right to marry but announced a new rule of federal law, we conclude that the decision applies retroactively to marriages (including common law marriages) predating that decision. Under the Court's retroactivity jurisprudence in the civil law context, when the Supreme Court "applies a rule of federal law to the parties before it, that rule . . . must be given full retroactive effect in all cases still open on direct review and as to all events, regardless of whether such events predate or postdate [the Court's] announcement of the rule." *Harper v. Va. Dep't of Tax'n*, 509 U.S. 86, 97 (1993). Because the *Obergefell* Court applied its rule of federal law to the litigants before it, we conclude that the Court's holding in

*Obergefell* that restrictions on same-sex marriages are unconstitutional must be given retroactive effect.

¶6     Accordingly, we agree with the district court that the parties here were not, as a matter of law, barred from entering into a common law marriage in 2003. Applying the refined test announced today in *Hogsett* for determining whether a couple has entered into a common law marriage, we uphold the district court's determination that the parties entered into a common law marriage. However, we reverse the court's division of property and award of spousal maintenance and remand for further findings in accordance with sections 14-10-113 and -114, C.R.S. (2020).

## I. Facts and Procedural History

¶7     On January 19, 2018, Timothy Pyfer filed a dissolution of marriage petition, alleging that he and his same-sex partner, Dean LaFleur, had entered into a common law marriage on November 30, 2003, when they held a ceremony.

¶8     LaFleur argued that, as a matter of law, the couple could not have entered into a common law marriage because "same sex marriages were not recognized or protected under Colorado law" at that time. LaFleur further argued that, as a matter of fact, he and Pyfer did not mutually agree to enter into a common law marriage, as required under the test articulated in *Lucero*.

¶9     Following an evidentiary hearing during which the court heard testimony from the parties and several of their family members and friends, the district court held that Pyfer and LaFleur entered into a common law marriage on November 30, 2003, the date of the ceremony. The court acknowledged that same-sex marriage was not recognized in Colorado until at least 2014. It reasoned, however, that same-sex couples' ability to marry was eventually "recognized as a fundamental right that could not be denied" and that this right was not "suddenly created" but "existed prior to 2014." Thus, the court concluded, Pyfer and LaFleur could enter into a common law marriage before Colorado recognized same-sex couples' right to marry.

¶10    The court acknowledged that it had to decide "whether one can exhibit the intent to be married [for purposes of establishing a common law marriage] when such a relationship is not cognizable under the law." The court then weighed the evidence from the hearing to determine the parties' intent to enter a marital relationship. It found that Pyfer proposed marriage to LaFleur and that Pyfer intended to be married. LaFleur accepted the proposal in front of Pyfer's sister, and the parties later participated in a ceremony in which they exchanged vows and rings before family and friends. The court noted that this ceremony "certainly appear[ed] to be a wedding." The court highlighted photographs in evidence showing that "[t]here were rings, tuxes, attendance [by friends and family], [a]

toast, vows, [and] a reverend," and it observed that Pyfer and LaFleur signed a document titled "Certificate of Holy Union." Moreover, after the ceremony, Pyfer "held himself out as married to family and friends" and listed LaFleur as his spouse on an HR form in 2016 and on a vehicle in 2017. LaFleur financially supported Pyfer and they cohabitated, sharing the same room until "the last couple of years" before the dissolution petition was filed.

¶11 LaFleur testified that he never intended to be married and would not have gone through with the ceremony had he thought it would be legally binding with respect to his assets. However, the court found that LaFleur knew that Pyfer was listing him as a spouse on documents and was telling his family and friends they were married, and there was no evidence that LaFleur ever confronted Pyfer about doing so.

¶12 The court acknowledged that neither Pyfer nor LaFleur "really wore their wedding rings"; that they "did not share bank accounts"; that LaFleur's family "denied that the parties were married" and "minimized the impact of the ceremony"; and that LaFleur did not "tell his co-workers he was married," although the court also heard testimony that LaFleur worked in an environment that was "not welcoming" of same-sex couples.

¶13 After weighing all of this evidence, the court ultimately found that, even if he "did not want all of the legal obligations that come with a marriage," LaFleur

8

"acquiesced when he accepted [Pyfer's marriage] proposal and went through with their ceremony" and "intended to be joined with [Pyfer] for the rest of his life" on the date of the ceremony. The court therefore concluded that Pyfer and LaFleur entered into a common law marriage on November 30, 2003.

¶14 The court then proceeded with the dissolution proceedings and entered a dissolution decree and permanent orders. The court awarded the entirety of the marital value of the home to LaFleur. It awarded $50,000 of LaFleur's Roth IRA to Pyfer and ordered each party to pay the debts accrued in his name. The court acknowledged that the spousal maintenance guidelines provided for an award of $734 per month for seven and a half years. However, it deviated downward from the guidelines and ordered $700 per month for four years, reasoning that Pyfer "lived rent-free" with LaFleur and, toward the end of the relationship, was engaged in an extramarital affair.

¶15 Pyfer appealed, arguing that the division of property was inequitable and not supported by sufficient findings; that the maintenance award was an unjustified downward deviation from the guidelines; and that both rulings constituted abuses of discretion. LaFleur cross-appealed, challenging the court's ruling that the parties had entered into a common law marriage.

¶16 After this court granted certiorari to review *Hogsett* and *Yudkin*, LaFleur petitioned this court under C.A.R. 50 to review this case along with the other two.

We accepted jurisdiction and directed the parties to focus their oral argument on the question of whether a common law same-sex marriage entered in Colorado may be recognized as predating Colorado's recognition of formal same-sex marriages.

## II. Timeliness of Cross-Appeal

¶17 As a threshold matter, Pyfer challenges LaFleur's notice of cross-appeal as untimely filed and asserts that this court has no jurisdiction to consider the question LaFleur raises regarding the retroactive effect of *Obergefell*. Pyfer argues that the district court issued a final judgment concerning the existence of a common law marriage on July 31, 2018, and that under C.A.R. 4(a), LaFleur had forty-nine days from the entry of that judgment to file a notice of appeal.

¶18 We have previously characterized a final judgment for purposes of an appeal "as one that ends the particular action in which it is entered, leaving nothing further for the court pronouncing it to do in order to completely determine the rights of the parties involved in the proceedings." *People v. Guatney*, 214 P.3d 1049, 1051 (Colo. 2009). Here, after entering the order concluding that Pyfer and LaFleur were common law married, the district court retained jurisdiction over the case and entered a decree of dissolution and permanent orders. The decree entered on October 15, 2018, was a final judgment ending the action. Pyfer filed his notice of appeal on November 30, 2018, which was within forty-nine days of

the entry of that order, and LaFleur filed his notice of cross-appeal fourteen days later. *See* C.A.R. 4(a) ("If a timely notice of appeal is filed by a party, any other party may file a notice of appeal within 14 days of the date on which the first notice of appeal is filed . . . ."). Accordingly, LaFleur's cross-appeal was timely, and we may address his claim.

### III. Analysis

¶19 We begin by explaining the development of marriage laws in Colorado, detailing the history of race- and gender-based restrictions on marriage. We then address the question of whether a court may recognize a common law same-sex marriage entered in Colorado before *Obergefell*. Applying the general rule that an unconstitutional statute is void ab initio, we conclude that state law restrictions on same-sex marriage cannot serve as an impediment to the recognition of a same-sex marriage predating *Obergefell*. Moreover, we conclude that, under *Harper*, *Obergefell* applies retroactively to marriages—including common law marriages—predating that decision.

¶20 Having concluded that Pyfer and LaFleur were not, as a matter of law, barred from entering into a common law marriage, we apply the refined framework announced in *Hogsett* and conclude that the parties did in fact enter into a common law marriage. Finally, we review the division of property and award of spousal maintenance and determine that the district court abused its

11

discretion in failing to follow the proper procedure or make appropriate findings as required by sections 14-10-113 and -114.

## A. Development of Marriage Laws in Colorado

¶21 Colorado is one of a minority of states that still recognizes common law marriages. As early as 1897, the court of appeals explained that "in this state[,] a marriage simply by agreement of the parties, followed by cohabitation as husband and wife, . . . may be valid and binding." *Taylor v. Taylor*, 50 P. 1049, 1049 (Colo. App. 1897).

¶22 As with statutory marriage, Colorado historically imposed restrictions on common law marriage that were later deemed to be unconstitutional. Until the mid-twentieth century, for example, common law marriage in Colorado was subject to anti-miscegenation laws. In *Jackson v. City & County of Denver*, 124 P.2d 240, 241 (Colo. 1942), an interracial couple who "liv[ed] together as though married" were convicted of vagrancy, which was defined under the Denver municipal code as "lead[ing] an . . . immoral . . . course of life." (Omissions in original.) The couple challenged their convictions, arguing on appeal that they were not vagrants because they had entered into a common law marriage. *Id.* This court rejected that argument, relying on a statute that had been in force from Colorado's territorial days providing that "[a]ll marriages between negroes or mulattoes, of either sex, and white persons, are . . . absolutely void." *Id.* We

12

reasoned that the "defendants could not, either ceremonially *or by common law*, be married," and therefore "they were, if living together, leading 'an immoral course of life.'" *Id.* (emphasis added).[2]

¶23 Fifteen years later, in 1957, the Colorado legislature repealed the statute imposing racial restrictions on ceremonial and common law marriage. Ch. 124, sec. 1, § 90-1-2, 1957 Colo. Sess. Laws 334, 334. And in *Loving v. Virginia*, 388 U.S. 1 (1967), the U.S. Supreme Court deemed such anti-miscegenation laws unconstitutional. There, the Court held that "[m]arriage is one of the 'basic civil rights of man,' fundamental to our very existence and survival," *id.* at 12 (quoting *Skinner v. Oklahoma ex rel. Williamson*, 316 U.S. 535, 541 (1942)), and that "[t]here can be no doubt that restricting the freedom to marry solely because of racial classifications violates the central meaning of the Equal Protection Clause," *id.*

¶24 Although this court was never asked to determine whether *Loving* applied to marriages predating that decision, courts presented with the issue either expressly held that the ruling applied retroactively to both ceremonial and

---

[2] Though the couple challenged the statute on equal protection grounds, we rejected their argument. *Jackson*, 124 P.2d at 241 (concluding that the statute did not discriminate on the basis of race because "[t]he statute applies to both white and black" persons). Today, we disavow our decision in *Jackson* and our failure in that case to recognize the racism animating Colorado's anti-miscegenation statute.

13

common law marriage, or assumed as much. *See, e.g.*, *Dick v. Reaves*, 434 P.2d 295, 298 (Okla. 1967) (holding that, in accordance with the U.S. Supreme Court's "clear mandate" in *Loving*, Oklahoma's anti-miscegenation laws violated equal protection and due process, and an interracial couple's 1939 marriage was therefore valid); *see also Prudential Ins. Co. of Am. v. Lewis*, 306 F. Supp. 1177, 1183–84 (N.D. Ala. 1969) (holding that an interracial couple could validly enter into a common law marriage where one spouse died prior to the decision in *Loving*); *Vetrano v. Gardner*, 290 F. Supp. 200, 203–06 (N.D. Miss. 1968) (assuming, without expressly deciding, that *Loving* operated retroactively, but nonetheless finding that the interracial couple in that case did not enter into a common law marriage before Mississippi abolished common law marriage in 1956).

¶25 Just as interracial marriages were prohibited in Colorado, so too were marriages between same-sex couples, though that legal history is more recent. In the early 1970s, after the Minnesota Supreme Court ruled that a state statute restricting marriage to different-sex couples was constitutional, *see Baker v. Nelson*, 191 N.W.2d 185, 187 (Minn. 1971), the U.S. Supreme Court dismissed the appeal of the case "for want of a substantial federal question," *Baker v. Nelson*, 409 U.S. 810, 810 (1972) (mem.).

¶26 At that time, Colorado statutes did not expressly restrict marriage to different-sex couples, which led to a dispute about whether Colorado would

14

recognize marriages between same-sex couples. In 1975, three years after the Supreme Court dismissed *Baker*, Clela Rorex, the Boulder County Clerk, issued the nation's first marriage license to a same-sex couple. *County Clerk Changes History*, PBS Independent Lens, (June 14, 2015), https://www.pbs.org/independentlens/videos/county-clerk-changes-history/ [https://perma.cc/9C7X-ZTRE]. The Boulder County District Attorney's office advised Rorex that Colorado law did not require marriage licenses to be between a man and a woman, and she issued several marriage licenses to same-sex couples until the Colorado Attorney General's office directed her to stop. *Id.*

¶27     The issue of same-sex marriage re-emerged in 1993, when the Hawaii Supreme Court ruled that the state's statutory ban on such marriages was presumed unconstitutional under Hawaii's equal protection clause. *Baehr v. Lewin*, 852 P.2d 44, 67–68 (Haw. 1993). The *Baehr* decision, which signaled the possibility that other jurisdictions might have to recognize same-sex marriages entered in Hawaii,[3] prompted Congress to pass the Defense of Marriage Act, Pub.

---

[3] Ultimately, Hawaii voters approved an amendment to the state constitution empowering the legislature to "reserve marriage to opposite-sex couples." Haw. Const. art. I, § 23. The Hawaii Supreme Court subsequently concluded that the state constitutional amendment rendered the challenge to the marriage statute moot. *Baehr v. Miike*, No. 91-1394-05, 1999 WL 35643448, at *1 (Haw. Dec. 9, 1999).

L. No. 104-199, 110 Stat. 2419 ("DOMA"). DOMA defined marriage as "a legal union between one man and one woman" for all federal purposes, 1 U.S.C. § 7, *invalidated by United States v. Windsor*, 570 U.S. 744, 775 (2013), and allowed states to refuse to give full faith and credit to same-sex marriages lawfully entered in other states, 28 U.S.C. § 1738C, *rendered obsolete by Obergefell*, 576 U.S. at 674–75. In the years that followed, most states adopted statutes and state constitutional amendments both prohibiting same-sex marriage within state borders and barring recognition of same-sex marriages entered elsewhere. *See* Michael J. Klarman, *From the Closet to the Altar: Courts, Backlash, and the Struggle for Same-Sex Marriage*, at xi (2012) ("Within a decade [of *Baehr*], more than thirty-five states . . . passed laws to 'defend' traditional marriage."). In 2000, Colorado similarly adopted a statute restricting marriage to "one man and one woman." § 14-2-104(1)(b), C.R.S. (2000); *see also id.* -104(2) (providing that a marriage between two persons of the same sex shall not be recognized regardless of where contracted).

¶28 Then, in a groundbreaking ruling in 2003, the Massachusetts Supreme Judicial Court held that same-sex marriage bans were unconstitutional under that state's constitution. *Goodridge v. Dep't of Pub. Health*, 798 N.E.2d 941, 948 (Mass. 2003) ("The question before us is whether, consistent with the Massachusetts Constitution, the Commonwealth may deny the protections, benefits, and obligations conferred by civil marriage to two individuals of the same sex who

16

wish to marry. We conclude that it may not."). In the years after *Goodridge*, a handful of state supreme courts reached similar conclusions under their respective constitutions. *See In re Marriage Cases*, 183 P.3d 384 (Cal. 2008), *superseded by constitutional amendment*, Cal. Const. art. I, § 7.5; *Kerrigan v. Comm'r of Pub. Health*, 957 A.2d 407 (Conn. 2008); *Varnum v. Brien*, 763 N.W.2d 862 (Iowa 2009). In Colorado, by contrast, voters approved a 2006 constitutional amendment declaring that "[o]nly a union of one man and one woman shall be valid or recognized as a marriage in this state." Colo. Const. art. II, § 31.

¶29 Although Colorado later passed legislation granting certain legal protections to same-sex couples through designated beneficiary agreements, § 15-22-102, C.R.S. (2009), and civil unions, § 14-15-102, C.R.S. (2013), these alternatives fell short of providing same-sex couples access to marriage on the same terms as different-sex couples.

¶30 In 2014, in companion cases from Utah and Oklahoma, the Tenth Circuit struck down those states' same-sex marriage bans under the Fourteenth Amendment. *Kitchen v. Herbert*, 755 F.3d 1193, 1229–30 (10th Cir. 2014) ("[W]e hold that under the Due Process and Equal Protection Clauses of the United States Constitution, those who wish to marry a person of the same sex are entitled to exercise the same fundamental right as is recognized for persons who wish to marry a person of the opposite sex, and that [Utah's same-sex marriage bans] do

17

not withstand constitutional scrutiny."); *Bishop v. Smith*, 760 F.3d 1070, 1082 (10th Cir. 2014) ("[Oklahoma] may not, consistent with the United States Constitution, prohibit same-sex marriages."). Construing the Tenth Circuit's rulings to mean that Colorado's prohibitions on same-sex marriage were likewise unconstitutional, a state and federal district court in Colorado each entered orders enjoining enforcement and application of those laws. *Burns v. Hickenlooper*, No. 14-cv-01817-RM-KLM, 2014 WL 3634834, at *1 (D. Colo. July 23, 2014); *Brinkman v. Long*, Nos. 13-CV-32572, 14-CV-30731, 2014 WL 3408024, at *15–21 (Colo. Dist. Ct. July 9, 2014). These courts' rulings were stayed pending petitions for U.S. Supreme Court review of *Kitchen* and *Bishop*. When the Court later denied the petitions on October 6, 2014, *Kitchen*, 574 U.S. 874 (2014) (No. 14-124); *Bishop*, 574 U.S. 875 (2014) (No. 14-136), the Tenth Circuit lifted its stay of the *Burns* preliminary injunction, the district court made its injunction permanent in *Burns v. Hickenlooper*, No. 14-cv-01817-RM-KLM, 2014 WL 5312541, at *1 (D. Colo. Oct. 17, 2014), and Colorado began to recognize same-sex marriages.

¶31 Eight months later, the U.S. Supreme Court handed down its decision in *Obergefell*. Reasoning that the fundamental right to marry "appl[ies] with equal force to same-sex couples," 576 U.S. at 665, the Court held that "under the Due Process and Equal Protection Clauses of the Fourteenth Amendment[,] couples of the same[]sex may not be deprived of that right and that liberty," *id.* at 675. In so

18

doing, the Court expressly overruled its earlier decision in *Baker*, *id.*, and held that it was unconstitutional for states "to bar same-sex couples from marriage on the same terms as accorded to couples of the opposite sex," *id.* at 680, or "to refuse to recognize a lawful same-sex marriage performed in another [s]tate on the ground of its same-sex character," *id.* at 681. Notably, the Court held that the various state laws challenged by the litigants in that case[4] were "invalid to the extent they exclude same-sex couples from civil marriage on the same terms and conditions as opposite-sex couples." *Id.* at 675–76.

## B. Recognition of a Common Law Same-Sex Marriage Before *Obergefell*

¶32 The question raised in this case is whether a court may recognize a common law same-sex marriage entered in Colorado before the state recognized same-sex couples' fundamental right to marry. LaFleur argues that he and Pyfer could not have entered into a common law marriage predating *Obergefell* because (1) the parties could not, as a matter of law, have formed the requisite intent to enter into a common law marriage when same-sex marriage was not recognized as lawful; and (2) *Obergefell* did not have retroactive effect. We disagree.

---

[4] *Obergefell* involved a collection of cases that originated in Michigan, Kentucky, Ohio, and Tennessee and were brought by fourteen same-sex couples and two men whose same-sex partners were deceased. 576 U.S. at 652–53.

## 1. *Obergefell* Rendered Colorado's Restrictions on Same-Sex Marriage Void Ab Initio

¶33     *Obergefell* struck down state laws that excluded same-sex couples from civil marriage as unconstitutional. 576 U.S. at 674–75. The longstanding general rule is that a statute that is declared unconstitutional is void ab initio; it is inoperative as if it had never been enacted. *Norton v. Shelby County*, 118 U.S. 425, 442 (1886) ("An unconstitutional act is not a law; it confers no rights; it imposes no duties; it affords no protection; . . . it is, in legal contemplation, as inoperative as though it had never been passed."); *Coulter v. Routt Cnty. Comm'rs*, 11 P. 199, 203 (Colo. 1886) ("When a statute is adjudged to be unconstitutional, it is as if it never had been." (quoting Thomas M. Cooley, *A Treatise on the Constitutional Limitations Which Rest upon the Legislative Power of the States of the American Union* 188 (2d ed. 1871))); *see also* 16A Am. Jur. 2d *Constitutional Law* § 194 (2020) ("Since unconstitutionality dates from the time of its enactment and not merely from the date of the decision so branding it, an unconstitutional law, in legal contemplation, is as inoperative as if it had never been passed and never existed; that is, it is void ab initio." (footnotes omitted)).

¶34     Under this principle, state law restrictions on same-sex marriage—such as Colo. Const. art. II, § 31, and section 14-2-104(1)(b) and -104(2)—deemed unconstitutional in *Obergefell,* cannot stand as an impediment to the recognition of a same-sex marriage predating that decision. Recognition of a same-sex marriage

is the remedy for the state's earlier violation of the couple's constitutional rights; the failure to recognize such a marriage effectively continues to enforce the very laws deemed invalid. By logical extension, because *Obergefell* held that states must allow same-sex couples to enter marriages on the "same terms and conditions as opposite-sex couples," *Obergefell*, 576 U.S. at 676, and because Colorado recognizes *common law* marriages between opposite sex-couples, it must also recognize such marriages between same-sex couples—including those entered into pre-*Obergefell*.

¶35 We find *In re Estate of Carter*, 159 A.3d 970 (Pa. Super. Ct. 2017), instructive on this point. There, a Pennsylvania appellate court reversed a lower court's ruling that it was "legally impossible" for a same-sex couple to prove a common law marriage where the state abolished common law marriages in 2005 and same-sex marriages were not recognized until May 2014. *Id.* at 977. The court observed that the premise of the lower court's analysis—that the state's now-invalidated exclusionary marriage law was legally binding during the time the couple might otherwise have entered into a common law marriage—"misreads the fundamental import" of *Obergefell*. *Id.* It concluded that "a court today may not rely on the now-invalidated provisions of the Marriage Law to deny th[e] constitutional reality" that "same-sex couples have precisely the same capacity to enter marriage contracts as do opposite-sex couples," *id.*, and held that because different-sex

couples may establish a common law marriage predating 2005, same-sex couples must also have that right, *id.* at 977–78.

¶36 For the same reason, we disagree with the South Carolina Court of Appeals' decision in *Swicegood v. Thompson*, 847 S.E.2d 104, 112 (S.C. App. 2020), which held that the state's marriage statute, although invalidated by *Obergefell*, nevertheless "operated as an impediment to the formation of a common-law marriage between same-sex couples *when it was still in force*." (Emphasis added.) This view mistakenly assumes that the unconstitutional law, although void, was ever in force. "[W]hat a court does with regard to an unconstitutional law is simply to ignore it. It decides the case '*disregarding the [unconstitutional] law*,' because a law repugnant to the Constitution 'is void, and is as no law.'" *Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 760 (1995) (Scalia, J., concurring) (alteration in original) (citations omitted) (first quoting *Marbury v. Madison*, 5 U.S. 137, 178 (1803); and then quoting *Ex parte Siebold*, 100 U.S. 371, 376 (1880)). To treat a law repugnant to the Constitution as a barrier to forming an agreement to be married fails to disregard that unconstitutional law; indeed, it resurrects it. Put differently, to hold that a same-sex couple may enter a marriage only *after Obergefell* wholly disregards the effect of that decision.

¶37 Similarly, we reject LaFleur's contention that, as a matter of law, it was impossible for a same-sex couple to form the requisite intent to enter into a

22

common law marriage before Colorado recognized same-sex couples' fundamental right to marry.

¶38    As we hold today in *Hogsett*, to enter the legal and social institution of marriage, a couple must mutually agree "to enter a *marital* relationship — that is, to share a life together as spouses in a committed, intimate relationship of mutual support and obligation."  *Hogsett*, ¶ 3.  That the marital relationship was not recognized at the time does not change the nature of the relationship itself.  An analogy to anti-miscegenation laws is instructive.  LaFleur's argument suggests that an interracial couple lacked the capacity, as a matter of law, to enter into a marriage pre-*Loving* because the state in which they resided did not recognize the relationship.  But, as noted above, courts rejected such logic in the wake of the *Loving* decision.  *See, e.g.*, *Reaves*, 434 P.2d at 298; *Lewis*, 306 F. Supp. at 1183–84.  In the wake of *Obergefell*, we do the same for same-sex couples.

¶39    To the extent that LaFleur contends that he did not anticipate that his relationship could carry legal consequences, we are unpersuaded.  Many couples may not appreciate or intend the legal consequences of entering into a marital relationship, or anticipate the ways in which those consequences may shift over

23

time as the law evolves.[5] But a couple need not intend the *legal consequences* of a marital relationship in order to intend to enter into the relationship itself. *See Hogsett*, ¶ 54 ("Parties asserting a common law marriage need not prove that they had detailed knowledge of and intent to obtain all the legal consequences that attach to marriage."). Instead, the focus is on whether the parties intended to enter into a relationship that is *marital in nature*. *See Hogsett*, ¶ 49 ("The key question is whether the parties mutually intended to enter a *marital* relationship—that is, to share a life together as spouses in a committed, intimate relationship of mutual support and mutual obligation."). The myriad rights, benefits, and responsibilities

---

[5] We disagree with LaFleur's attempt to paint lawful same-sex marriage as an unthinkable turn of events at the time of the parties' ceremony, given that the *Goodridge* opinion that struck down Massachusetts's same-sex marriage ban had been announced just two weeks earlier and was widely reported. *See, e.g., Gay-Marriage Ruling Hits Home—Both Sides See Extended Fight over Issue in Colorado*, Denver Post, Nov. 20, 2003, at B-01, NewsBank (explaining that "[v]olleys were already being fired between pro- and anti-gay rights factions [in Colorado], fewer than 24 hours after the controversial ruling by the Massachusetts Supreme Court" and speculating that "the Massachusetts decision will serve as a launching pad" for the invalidation of similar state and federal laws); Peggy Lowe & M.E. Sprengelmeyer, *State Split on Gay Ruling—Massachusetts Court Leaves Some Happy, Others Steaming*, Rocky Mountain News, Nov. 19, 2003, at 5A, NewsBank; David Von Drehle, *Gay Marriage is a Right, Massachusetts Court Rules*, Wash. Post (Nov. 19, 2003), https://www.washingtonpost.com/archive/politics/2003/11/19/gay-marriage-is-a-right-massachusetts-court-rules/98368878-a113-4710-9813-7c98ac5630d9/ [https://perma.cc/QM7Q-SV27]; Elizabeth Mehren, *Mass. High Court Backs Gay Marriage*, L.A. Times (Nov. 19, 2003), https://www.latimes.com/archives/la-xpm-2003-nov-19-na-marriage19-story.html [https://perma.cc/BPG8-E9TR].

bestowed on the marital relationship by the state reflect the government's and society's pledge to support and protect the union, but they are incidental to the marital relationship itself. *See Obergefell*, 576 U.S. at 669–70. Thus, the fact that a couple did not anticipate or intend the legal consequences of entering a marital relationship does not render their intent to enter into such a relationship legally impossible.

### 2. Any New Rule Announced in *Obergefell* Applies Retroactively

¶40    As a general rule, judicial decisions operate retroactively. Courts apply settled precedent and legal principles to the disputes before them, and litigants typically have no basis to argue that they are exempt from already-decided legal rules. *See James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 534 (1991). It is only when the law changes in some respect that the question of nonretroactivity arises—that is, whether the court should apply the old rule or the new one. *Id.*

¶41    In *Obergefell*, the Supreme Court did not purport to announce a new right; instead, it declared that the long-recognized fundamental right to marry could "[n]o longer . . . be denied" to same-sex couples. 576 U.S. at 675. Thus, it is questionable whether *Obergefell* calls for nonretroactivity analysis. However, even assuming *Obergefell* did not merely recognize an existing fundamental right to marry but instead announced a new rule of federal law, we conclude that the

25

decision applies retroactively to marriages (including common law marriages) predating that decision.

¶42 Whether *Obergefell* applies retroactively is a question of federal law. The U.S. Supreme Court has recognized that state courts enjoy freedom "to limit the retroactive operation of their own interpretations of state law," *Harper*, 509 U.S. at 100, but the "question is a federal one where the rule at issue itself derives from federal law, constitutional or otherwise," *Beam Distilling Co.*, 501 U.S. at 535.[6]

¶43 Though the U.S. Supreme Court's framework for assessing the retroactive effect of its decisions has evolved over the past thirty years, *see Chevron Oil Co. v. Huson*, 404 U.S. 97, 106–07 (1971); *Beam Distilling Co.*, 501 U.S. at 535–39, under the Court's more recent case law, it is clear that "[w]hen [the U.S. Supreme] Court applies a rule of federal law to the parties before it, that rule is the controlling

---

[6] The parties briefed this case under the standards governing retroactivity that this court identified in *Marinez v. Industrial Commission of the State of Colorado*, 746 P.2d 552, 556 (Colo. 1987) (applying the factors from the U.S. Supreme Court decision in *Chevron Oil Co. v. Huson*, 404 U.S. 97 (1971)). However, *Marinez* involved a *state* court ruling. We have relied on the *Chevron Oil* factors in determining whether to apply a state court ruling retroactively, *see Martin Marietta Corp. v. Lorenz*, 823 P.2d 100, 112 n.7 (Colo. 1992) (continuing "to adhere to the *Chevron* analysis in resolving the issue of retroactive or prospective application of [a] state judicial decision"). But this case concerns retroactive application of a question of *federal* constitutional law. We are therefore bound by the U.S. Supreme Court's case law. *See Beam Distilling Co.*, 501 U.S. at 544 (deviating from the *Chevron Oil* retroactivity analysis).

interpretation of federal law and must be given full retroactive effect in all cases still open on direct review and *as to all events, regardless of whether such events predate or postdate [the Court's] announcement of the rule,*" *Harper*, 509 U.S. at 97 (emphasis added).[7]

¶44 In *Obergefell*, the Supreme Court did not reserve the question of whether the rule of law announced in the case—that the Constitution entitles same-sex couples to civil marriage "on the same terms and conditions as opposite-sex couples"—operated only prospectively. *See* 576 U.S. at 674–76, 679–81. Rather, the Court applied the ruling to the parties in the controversy before it. *Id.*

¶45 Thus, under *Harper*, we conclude that *Obergefell*'s holding that restrictions on same-sex marriages are unconstitutional "must be given full retroactive

---

[7] Though this approach "has been attacked for its failure to take account of reliance on" now-changed law, *Beam Distilling Co.*, 501 U.S. at 536, it comports with the declaratory theory of law that judges "find the law" rather than "make it" or amend it, *id.* at 535–36; *see also James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 549 (1991) (Scalia, J., concurring) (observing that judges "make" the law only insofar as they "find" it, "discerning what the law *is*, rather than decreeing what it is today *changed to*, or what it will *tomorrow* be"); Kermit Roosevelt III, *A Retroactivity Retrospective, with Thoughts for the Future: What the Supreme Court Learned from Paul Mishkin and What it Might*, 95 Cal. L. Rev. 1677, 1680–81 (2007) ("[T]he Court has no power to make law; law's source is never the Court. An overruled decision is thus simply mistaken, and once the overruling court recognizes the mistake, it must also conclude that the law has always been what it is now declared to be.").

effect . . . as to all events, regardless of whether such events predate or postdate" the decision. *Harper*, 509 U.S. at 97. Because a different-sex couple may prove a common law marriage in Colorado predating 2014, a same-sex couple must also have that opportunity. Accordingly, courts may recognize a common law same-sex marriage entered in Colorado before the state acknowledged the right of same-sex couples to marry.

¶46 Virtually every other jurisdiction to consider this question thus far has held that *Obergefell* applies retroactively to allow recognition of a common law same-sex marriage predating the decision. *See, e.g.*, *Ranolls v. Dewling*, 223 F. Supp. 3d 613, 622 (E.D. Tex. 2016) (concluding that under the framework set forth in *Beam Distilling Co.* and *Harper*, *Obergefell* applied retroactively); *Gill v. Nostrand*, 206 A.3d 869, 874–75 (D.C. 2019) ("We now expressly recognize, as the trial court did and as *Obergefell* [and other authorities] require, that a same-sex couple may enter into common-law marriage in the District of Columbia and that this rule applies retroactively."); *In re J.K.N.A.*, 454 P.3d 642, 649 (Mont. 2019) ("*Obergefell*'s holding that state prohibitions against same-sex marriage violate the United States

28

Constitution operates retroactively in relation to [a party's] claim that a common law marriage existed with [her same-sex partner] . . . .").[8]

¶47 One deviation from this trend is the *Swicegood* decision discussed above. Notably, the *Swicegood* court held (consistent with *Ranolls*, *Gill*, and *In re J.K.N.A.*) that its review of U.S. Supreme Court case law "compels the conclusion [that] *Obergefell* must be applied retroactively." 847 S.E.2d at 110. And yet the court reasoned that the state's invalidated marriage statute was "'a pre-existing, separate, independent rule of state law, having nothing to do with retroactivity,' which formed an 'independent legal basis' for" denying relief. *Id.* at 112 (quoting *Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 756 (1995) (majority opinion)).

¶48 The *Swicegood* court's reliance on *Reynoldsville Casket* is misguided. In that case, the U.S. Supreme Court acknowledged that "when two different rules of law each independently bar recovery, then a decision" that retroactively invalidates one rule will not affect the result so long as "[t]he other, constitutionally adequate rule remains in place." *Reynoldsville Casket*, 514 U.S. at 757. But this principle does not allow a same-sex marriage ban to operate as an impediment to the formation

---

[8] The court of appeals division in *Hogsett* arrived at the same conclusion. *In re Marriage of Hogsett & Neale*, 2018 COA 176, ¶ 22, __ P.3d __ ("Inherent in our conclusion is the recognition that *Obergefell* applies retroactively in determining the existence of a common law marriage.").

of a common law marriage because, for the reasons discussed earlier, such an impediment would "critically depend[] upon the continued application of . . . a principle that [the] Court has held unconstitutional." *Id.*[9] Any impediment to marriage imposed by a same-sex marriage ban is not a "constitutionally adequate rule"—it is part and parcel with the unconstitutional law itself. Holding otherwise, as the *Swicegood* decision itself demonstrates, renders the acknowledged retroactivity of *Obergefell* utterly meaningless.

¶49 In sum, for the reasons above, we conclude that a court may recognize a common law same-sex marriage entered in Colorado before the state recognized same-sex couples' fundamental right to marry.

## C. Application of the Updated Common Law Marriage Framework

¶50 Having concluded that Pyfer and LaFleur were not, as a matter of law, barred from entering into a common law marriage, we next determine whether a common law marriage was established under the refined test we announce in *Hogsett*. "A determination of whether a common law marriage exists turns on

---

[9] This fact distinguishes South Carolina's same-sex marriage ban from other "impediments" to marriage discussed by the court. *See Swicegood*, 847 S.E.2d at 109 (discussing impediments such as where one party has an existing marriage or where the parties reside in a jurisdiction that does not recognize common law marriage).

issues of fact and credibility, which are properly within the trial court's discretion." *Lucero*, 747 P.2d at 665. Accordingly, we review the court's factual findings for clear error and its common law marriage finding for an abuse of discretion.

¶51 LaFleur argues that the parties did not, as a factual matter, have the intent to enter into a common law marriage. We disagree and conclude that the record supports the district court's conclusion that Pyfer and LaFleur manifested a mutual intent to enter into a marital relationship.

¶52 "[A] common law marriage may be established by the mutual consent or agreement of the couple to enter the legal and social institution of marriage, followed by conduct manifesting that mutual agreement." *Hogsett*, ¶ 49. "In assessing whether a common law marriage has been established, courts should give weight to evidence reflecting a couple's express agreement to marry." *Id.* In the absence of such evidence, courts may infer such an agreement from the parties' conduct. *Id.*

¶53 As we explain in *Hogsett*, the factors identified in *Lucero*, 747 P.2d at 665, can still be relevant to this inquiry. Courts should therefore consider factors such as

> cohabitation[;] reputation in the community as spouses[;] maintenance of joint banking and credit accounts[;] purchase and joint ownership of property[;] filing of joint tax returns[;] . . . the use of one spouse's surname by the other or by children raised by the parties[;] . . . evidence of shared financial responsibility, such as leases in both partners' names, joint bills, or other payment records;

31

> evidence of joint estate planning, including wills, powers of attorney, beneficiary and emergency contact designations; . . . symbols of commitment, such as ceremonies, anniversaries, cards, gifts, and the couple's references to or labels for one another[;] . . . [and] the parties' sincerely held beliefs regarding the institution of marriage.

*Hogsett*, ¶¶ 55–56. These factors must be assessed in context, however, and "the inferences to be drawn from the parties' conduct may vary depending on the circumstances." *Id.* at ¶ 49.

¶54 As in *Hogsett*, "[w]e begin by reviewing evidence of an express agreement to marry." ¶ 62. Here, Pyfer proposed marriage to LaFleur, and LaFleur accepted. The parties then participated in a ceremony that, as the district court explained, "certainly appear[ed] to be a wedding." For instance, Pyfer and LaFleur exchanged vows during the ceremony, which was officiated by a reverend and was attended by friends and family. They exchanged rings and wore tuxedos. A toast was given. And Pyfer and LaFleur signed a document titled "Certificate of Holy Union"—much like a couple would sign a marriage license. This evidence suggests, as the district court found, that the parties expressly agreed to enter into a common law marriage as of November 30, 2003, the date of the ceremony.

¶55 That said, given the range of meanings that a same-sex couple might ascribe to such a ceremony before *Obergefell*, it is important to examine the other circumstances of the relationship to discern the parties' intent. *Hogsett*, ¶ 54 n.9. Here, the parties' conduct was such that, in addition to the ceremony, a mutual

32

agreement to enter into a marital relationship may be inferred. Of course, some of the evidence does not point in either direction. While it would have been significant had one of the parties used the other's surname, for example, the fact that they did not do so does not necessarily suggest that the parties did not intend to be married. *See Hogsett*, ¶ 45 ("[T]here may be any number of reasons, including cultural ones, that spouses and children do not take one partner's name at marriage."). Similarly, the parties' failure to file joint tax returns reveals little, especially given that for the majority of their relationship, this was not a possibility under federal law. *See Hogsett*, ¶ 66.

¶56 Other factors, by contrast, are more instructive. Although the parties did not share joint bank accounts or own property together, they cohabitated, and LaFleur financially supported Pyfer, both in his day-to-day life and in his pursuit of a career. And Pyfer listed LaFleur as his spouse on several forms over the years.

¶57 LaFleur did not tell his coworkers that he was married. But there was testimony that LaFleur worked in an environment that was not welcoming of same-sex couples; thus, viewed in context, his failure to publicize his relationship with Pyfer does not necessarily reflect a lack of mutual agreement to be married. *See Hogsett*, ¶ 51 ("There may be cases where, particularly for same-sex partners, a couple's choice not to broadly publicize the nature of their relationship may be explained by reasons other than their lack of mutual agreement to be married.").

Pyfer, by contrast, "held himself out as married to family and friends" with LaFleur's knowledge.

¶58 True, there was evidence, toward the end of their relationship, that Pyfer was involved in an extramarital affair and that Pyfer and LaFleur ceased sharing a bedroom and instead lived separately in the same house. However, the parties' actions as their relationship deteriorated cannot be used to override their earlier agreement to be married. *See Hogsett*, ¶ 57 ("[C]onduct inconsistent with marriage that occurs as a relationship is breaking down should not negate a finding of common law marriage where there is evidence of the parties' earlier mutual agreement to be married. In other words, infidelity, physical separation, or other conduct arising as the relationship is ending does not invalidate a couple's prior mutual agreement to enter a common law marriage.").

¶59 In short, viewing the record as a whole and considering the totality of the circumstances, the district court's conclusion that the parties mutually agreed to be married and "intended to be joined with [each other] for the rest of [their] li[ves]" is supported by the record. Accordingly, we affirm the court's conclusion that Pyfer and LaFleur entered into a common law marriage.

### D. Allocation of Marital Assets and Debts and Award of Spousal Maintenance

¶60 Pyfer contends that the district court abused its discretion in allocating the marital assets and debts between Pyfer and LaFleur, arguing that the court did not

34

make adequate findings or adequately consider the statutory factors pursuant to section 14-10-113. Pyfer also contends that the court abused its discretion in awarding a grossly inadequate award of spousal maintenance, arguing that it (1) did not make adequate findings or adequately consider the statutory factors pursuant to section 14-10-114; (2) incorrectly computed the guideline amount of maintenance; and (3) did not consider the division of property and denial of Pyfer's request for attorney's fees. We agree and therefore remand for the district court to reconsider its property division and spousal maintenance award and make appropriate findings under sections 14-10-113 and -114.

## 1. Division of Property

¶61 The division of marital property is left to the district court's discretion. *In re Marriage of Cardona & Castro*, 2014 CO 3, ¶ 9, 316 P.3d 626, 629 (citing *In re Marriage of Hunt*, 909 P.2d 525, 537 (Colo. 1995)). We will not disturb the district court's division of property "unless there has been a clear abuse of discretion," *In re Balanson*, 25 P.3d 28, 35 (Colo. 2001), that, when viewed in relation to the property division as a whole, "affects the substantial rights of the parties," *id.* at 36.

¶62 Section 14-10-113(1) provides that the court "shall set apart to each spouse his or her property and shall divide the marital property, without regard to marital misconduct, in such proportions as the court deems just." In making its equitable distribution of marital property, the court must consider "all relevant factors,"

including (1) each spouse's contribution "to the acquisition of the marital property, including the contribution of a spouse as homemaker;" (2) "[t]he value of the property set apart to each spouse;" and (3) each spouse's economic circumstances "at the time the division of property is to become effective." *Id.*

¶63 We have interpreted section 14-10-113 to require a multi-step analysis. *See Balanson*, 25 P.3d at 38. First, the district court must determine "whether an interest constitutes property." *Id.* If so, the court then must classify such property as marital or separate. *Id.* Finally, it must value and make an equitable distribution of the marital property after considering the statutory factors. *Id.*

¶64 Here, we cannot tell from the record whether the district court engaged in such an analysis. It was uncontested that the $160,000 increase in value of LaFleur's home was marital property. But LaFleur maintained multiple retirement accounts, some of which predated the marriage, and the court did not classify the contents of those accounts as separate or marital property. Indeed, neither LaFleur nor the court traced the contents of those retirement accounts—a requirement to claiming separate ownership. *See In re Marriage of Seewald*, 22 P.3d 580, 586 (Colo. App. 2001) ("The court also did not make any findings concerning the classification of the specific assets comprising the trust, including whether husband was able to trace the present trust assets back to his premarital holdings sufficiently to overcome the presumption of marital property." (citing *In re*

36

*Marriage of Renier*, 854 P.2d 1382, 1384 (Colo. App. 1993))). Instead, the court awarded Pyfer $50,000 of LaFleur's Roth IRA and ordered that the remaining retirement assets be retained by the named account holder. The court took a similar approach regarding each party's debts, stating, "[E]ach party is to pay all debts in his name." The court did not attempt to determine whether such debt was separate or marital.

¶65 Consequently, we are unable to determine whether the district court's property division was inequitable, and we must set aside the property division and remand for further proceedings. Upon reconsideration, the parties may well end up in the same position. But the court must first conduct the multi-step analysis by classifying each item of property as separate or marital, valuating the property, and considering the statutory factors identified in section 14-10-113.[10]

---

[10] On remand, the court should consider each party's financial, emotional, and other contributions to the relationship. For example, at the permanent orders hearing, the court noted that Pyfer stayed home and did not work or pay rent to LaFleur. Yet in marital relationships, one spouse often financially supports the other. Having concluded that Pyfer and LaFleur had entered into a common law marriage, it is not clear why the court expected one spouse to pay rent to the other to live in the couple's marital home. Moreover, the fact that Pyfer did not hold a steady job does not mean he did not contribute to the marital relationship in a meaningful way, nor should the fact that he did not work be held against Pyfer in equitably distributing the marital assets and debts or awarding spousal maintenance.

## 2. Award of Spousal Maintenance

¶66 "[A]wards of spousal maintenance . . . flow from the property distribution." *In re Marriage of de Koning*, 2016 CO 2, ¶ 26, 364 P.3d 494, 498. In other words, "the issues are interdependent." *Id.* Therefore, "[w]hen a trial court is required to revisit a property division, it must also reevaluate [the] maintenance . . . award[] in light of the updated property division." *Id.* Accordingly, we also set aside the maintenance award and remand for reconsideration. On remand, the district court should follow the detailed procedure set forth in section 14-10-114, making explicit factual findings where required and addressing the factors relevant to its determination.

## IV. Conclusion

¶67 We conclude that, because *Obergefell* struck down state laws that excluded same-sex couples from civil marriage as unconstitutional, such laws cannot stand as an impediment to the recognition of a same-sex marriage predating that decision, but rather are treated as if they never existed. To the extent *Obergefell* announced a new rule of federal law, that decision applies retroactively under *Harper* because the Court in *Obergefell* applied its rule of federal law to the litigants before it. We therefore hold that a court may recognize a common law same-sex marriage entered in Colorado before the state recognized same-sex couples' fundamental right to marry.

¶68 Accordingly, we agree with the district court that the parties here were not, as a matter of law, barred from entering into a common law marriage in 2003. Applying the updated framework announced in *Hogsett*, we also agree with the court that the parties did in fact enter into a common law marriage. We nevertheless reverse the district court's division of property and award of spousal maintenance and remand for further findings in accordance with sections 14-10-113 and -114.

**CHIEF JUSTICE BOATRIGHT** concurs in part and concurs in the judgment.
**JUSTICE SAMOUR** dissents.

CHIEF JUSTICE BOATRIGHT, concurring in part and concurring in the judgment.

¶69 For the reasons stated in my concurrence in the judgment only to *In re Marriage of Hogsett & Neale*, 2021 CO 1, __ P.3d __ (Boatright, C.J., concurring in the judgment only), I disagree with the majority's decision to announce new factors for establishing common law marriage on the facts of that case. As a result, I do not think that the same new factors should be applied here. Furthermore, application of any factors is unnecessary because, in my view, the fact that Dean LaFleur and Timothy Pyfer had a ceremony that was—in every way—a wedding evinces their mutual intent to be married. In the simplest of terms, LaFleur and Pyfer are married because they had a wedding. I do agree with the majority, however, that the fundamental right to marry as outlined in *Obergefell v. Hodges*, 576 U.S. 644, 674–75 (2015), "must be given retroactive effect." Maj. op. ¶ 5. I also agree that LaFleur and Pyfer did, in fact, enter into a common law marriage, and that remand is appropriate for the district court to reconsider its property division and spousal maintenance award as well as make appropriate findings. Accordingly, I concur in part and concur in the judgment.

¶70 As the majority acknowledges, LaFleur and Pyfer held a ceremony on November 30, 2003, after Pyfer proposed marriage to LaFleur. *Id.* at ¶¶ 7, 10. In the district court's words, "[t]here were rings, tuxes, attendance [by friends and family], [a] toast, vows, [and] a reverend," and the couple signed a "Certificate of

1

Holy Union." *Id.* at ¶ 10. This, the district court explained, "certainly appear[ed] to be a wedding." *Id.* I agree. In my view, this *was* indisputably a wedding ceremony and effectively an "express agreement to marry." In fact, I struggle to imagine stronger evidence of the couple's "mutual consent or agreement . . . to enter the legal and social institution of marriage." *See Hogsett*, ¶ 3. With such strong evidence substantiating mutual intent, therefore, it is clear—without application of factors—that LaFleur and Pyfer were in a common law marriage.

¶71 As I stated in my concurrence in the judgment only in *Hogsett*, when the record clearly establishes whether or not both parties intended to be married, a factors-based analysis proves a needlessly confusing and futile exercise. This case provides another good example of such an exercise: After reviewing the details of the ceremony and acknowledging the district court's finding that—on the basis of the intent demonstrated by the ceremony—the parties entered into a common law marriage, the majority explains that, "the parties' conduct was such that, in addition to the ceremony, a mutual agreement to enter into a marital relationship may be inferred." Maj. op. at ¶ 54–55. In the discussion that follows, the majority acknowledges that "some of the evidence [considered under the factors] does not point in either direction," while "[o]ther factors, by contrast, are more instructive." *Id.* at ¶¶ 55, 56. This evidence and these factors include the parties' use of different surnames, failure to file joint tax returns, financial arrangements, cohabitation,

2

public manifestations (or lack thereof) of marriage, and behavior when the relationship disintegrated. *Id.* at ¶¶ 55–58. In reaching its conclusion, the majority explains that, "viewing the record as a whole and considering the totality of the circumstances," the district court's "conclusion that the parties mutually agreed to be married . . . is supported by the record" and that, therefore, the parties entered into a common law marriage. *Id.* at ¶ 59.

¶72 I agree with the district court's conclusion that the parties mutually agreed to be married—on the basis of the intent demonstrated by the wedding ceremony. The majority's factor-based analysis does not add to the district court's already-apparent and correct conclusion. Thus, any factors-based analysis proves unnecessary.

¶73 In addition, establishing a specific date or at least an approximate timeframe for when the parties would have entered into a common law marriage is important because any conduct *after* the marriage began is not relevant—in a factor-based analysis or otherwise—to determining whether a common law marriage existed in the first place. The majority correctly notes in *Hogsett*, and reiterates here, that "conduct inconsistent with marriage that occurs as a relationship is breaking down does not negate a finding of common law marriage where there is evidence of the parties' earlier mutual agreement to be married." *Hogsett*, ¶ 57. This statement does not, in my view, go the full distance. Indeed, conduct inconsistent with

3

marriage that occurs *after* the marriage *began*—not just as the relationship is breaking down—is not relevant.  If the evidence demonstrates that the parties formed a mutual intent to be married, then the parties entered into a common law marriage at that time.  Any post-marriage evidence falls outside the scope of the inquiry.  Here, it is evident when the parties' marriage began: at their wedding ceremony on November 30, 2003.  The majority's factor-based analysis nevertheless—and, in my view, erroneously—relies on evidence from after that point.

¶74    Furthermore, just as infidelity, separation, or other conduct inconsistent with marriage by a partner in a licensed marriage does not invalidate the licensed marriage, conduct inconsistent with marriage by a partner in a common law marriage does not invalidate the common law marriage.  In other words, parties who enter into licensed or common law marriages remain married until they legally divorce, regardless of their conduct.  To consider post-agreement-to-be-married evidence for common law marriages would be tantamount to considering the fictional concept of common law divorce.[1]  Thus, the fact that LaFleur and

---

[1] No one asserts that common law divorce exists; and no one would reasonably argue that infidelity, separation, or other conduct inconsistent with marriage would constitute evidence that parties did not originally intend to be married—especially after the couple had a wedding ceremony.

Pyfer's relationship eventually deteriorated is not relevant to the fact that they were common law married on November 30, 2003, and any factors relying on conduct after that date are, in my view, irrelevant.

¶75    In sum, I disagree with the majority's decision to announce new factors for establishing common law marriage in *Hogsett* on the facts of that case, and therefore, do not think those factors should be applied in this case.  Because I do agree with the majority, however, that the fundamental right to marry as outlined in *Obergefell*, 576 U.S. at 674–75, "must be given retroactive effect," maj. op. ¶ 5; that LaFleur and Pyfer did, in fact, enter into a common law marriage; and that remand is appropriate for the district court to reconsider its property division and spousal maintenance award as well as make appropriate findings, I concur in part and concur in the judgment.

JUSTICE SAMOUR, dissenting.

## I. Introduction

¶76     Is it possible for a same-sex couple in Colorado to have *mutually intended and agreed* to enter into a *legal* marital relationship when both parties were aware that Colorado law prohibited same-sex marriage at the time?  The answer is clearly no.  When Pyfer and LaFleur participated in their wedding ceremony in November 2003, they both understood that same-sex couples could not lawfully marry in Colorado because Colorado considered same-sex marriage unlawful, unenforceable, and invalid.  Thus, Pyfer and LaFleur could not possibly have *intended or agreed* to enter into the *legal* relationship of marriage.  And, because common law marriage in Colorado requires *mutual intent and agreement* to enter into the *legal* relationship of marriage, *In re Marriage of Hogsett & Neale*, 2021 CO 1, ¶ 49, __ P.3d __, __, Pyfer and LaFleur cannot be deemed to have entered into a common law marriage.

¶77     Only after the Supreme Court's decision in *Obergefell v. Hodges*, 576 U.S. 644 (2015), rendered our state's ban on same-sex marriage unconstitutional could Pyfer and LaFleur have mutually intended and agreed to enter into a common law

marriage.[1] But *Obergefell* wasn't announced until June 2015—more than a decade after Pyfer and LaFleur had their wedding ceremony.

¶78 The majority correctly notes that our state's restriction on same-sex marriage was rendered void ab initio by *Obergefell* and must be treated as though it never existed. Maj. op. ¶ 33. But the majority then concludes—rather simplistically—that, as a result, there was no impediment to Pyfer and LaFleur being common law married. *Id.* at ¶ 34. Alternatively, the majority rules that *Obergefell* applies retroactively. *Id.* at ¶ 41. The majority misses the mark on both fronts. As a matter of law, neither *Obergefell*'s effect on our state law nor *Obergefell*'s retroactive application can transform Pyfer and LaFleur's mutual intent and agreement at the time of their wedding ceremony in 2003.

¶79 Rather than concede that the mutual intent and agreement requirement is a fly in the analytical ointment, the majority shoehorns Pyfer and LaFleur's relationship into the confines of a common law marriage by engaging in a two-

---

[1] The majority points out that in 2014, eight months before *Obergefell*, two Tenth Circuit cases out of Utah and Oklahoma had effectively declared Colorado's prohibition on same-sex marriage unconstitutional. Maj. op. ¶ 30 (indicating that "Colorado began to recognize same-sex marriages" in October 2014). Be that as it may, given the way we framed the question we agreed to review, I assume for purposes of this dissent that Colorado's prohibition on same-sex marriage became unconstitutional when *Obergefell* was penned in June 2015.

2

step dance. First, the majority pays lip service to, but declines to meaningfully embrace, the requirement regarding mutual intent and agreement to enter into a *legal* marital relationship—a requirement embedded in Colorado's common law marriage jurisprudence. In the process, the majority clouds the issue by downgrading this requirement and affording preeminence to a different requirement—intent and agreement to enter into *any* type of marital relationship (legal or otherwise). Second, the majority curiously rules that, while it is true that the parties must have intended and agreed to enter into the *legal* and social *institution* of marriage, they need not have intended and agreed to incur the consequences of a legally sanctioned marriage.

¶80 The majority attempts to maneuver a judicial tightrope today. But I find its approach, at best, strained beyond the breaking point and, at worst, internally inconsistent. Because the majority's position is legally untenable, utterly unfair to LaFleur as well as many others in his shoes, and likely to foster further confusion in this area of the law, I respectfully dissent.[2]

---

[2] I wholeheartedly agree with the concerns Justice Hart eloquently expresses about common law marriage in her special concurrence in *In re Marriage of Hogsett & Neale*, 2021 CO 1, __ P.3d __ (Hart, J., specially concurring).

## II. Analysis

¶81 As we observed in *People v. Lucero*, 747 P.2d 660, 663 (Colo. 1987), Colorado recognizes common law marriage, which dispenses with the formalities of a statutory, licensed marriage. In a common law marriage, two people create a *legally valid* marital relationship without having to hold a marriage ceremony conducted in accordance with statutory requirements. *In re Marriage of J.M.H. & Rouse*, 143 P.3d 1116, 1118 (Colo. App. 2006). A common law marriage is established "by the mutual consent or agreement of the parties" to enter into a *lawful* marital relationship, "followed by a mutual and open assumption" of that relationship. *Lucero*, 747 P.2d at 663.

¶82 Today, in the companion case of *In re Marriage of Hogsett & Neale*, the majority gives the relevant factors we articulated in *Lucero* a much-needed tune-up to account for our society's evolution during the last three-plus decades. I applaud those efforts. However, the majority and I part ways because, while it purports to preserve the analytical framework forged by *Lucero*, it effectively endorses a new common law marriage test by eroding the significance of the parties' intent and agreement to enter into a *legal* marital relationship.

¶83 The majority echoes *Lucero*'s principal lesson and holds that "a common law marriage may be established by the mutual consent or agreement of the couple to enter the *legal* and social institution of marriage, followed by conduct manifesting

4

that mutual agreement." *Hogsett*, ¶ 3 (emphasis added). But it then backtracks, explaining that "[t]he core query is whether the parties intended to enter a *marital* relationship—that is, to share a life together as spouses in a committed, intimate relationship of mutual support and obligation." *Id.* What happened to the "legal" aspect of the test? Why isn't that part of the "core query"?

¶84 Apparently, the majority considers mutual intent and agreement to enter into a *legal* marital relationship a *peripheral requirement* of common law marriage. But I don't understand the difference the majority draws between a core requirement and a peripheral requirement: Either something is a requirement or it isn't. And a peripheral requirement is, by definition, still a requirement.

¶85 Must the parties have intended and agreed to enter into a *legal* marital relationship? Or does it suffice that they intended and agreed to enter into *any* marital relationship (legal or otherwise)? It can't be both. If it's the former, I'm not sure why the majority demotes to peripheral status the requirement of mutual intent and agreement to enter into a legal marital relationship. And if it's the latter, the majority ought to come out and admit that it's overturning decades of precedent construing the common law as requiring a mutual intent and agreement to enter into a legal marital relationship. It is difficult to conclude that the majority isn't changing the common law today. After all, by framing the "core query" as it does, the majority drains all the life out of our longstanding common law marriage

5

requirement that couples mutually intend and agree to enter into a legal marital relationship.

¶86 Here, Pyfer cannot satisfy the requirement of mutual intent and agreement to enter into a legal marital relationship. The district court found that he proposed marriage to LaFleur, that LaFleur accepted his proposal, and that the two held a wedding ceremony in November 2003. But, at that time, the Colorado Constitution stated that "[o]nly a union of one man and one woman shall be valid or recognized as a marriage in this state." Colo. Const. art. 2, § 31, *invalidated by Obergefell v. Hodges*, 576 U.S. 644 (2015). Similarly, section 14-2-104, C.R.S. (2003), *invalidated by Obergefell v. Hodges*, 576 U.S. 644 (2015), provided, as pertinent here, that "a marriage is valid in this state if . . . [i]t is only between one man and one woman." § 14-2-104(1)(b). Subsection (2) of the same statute reiterated that "any marriage contracted within . . . this state" not between one man and one woman shall not be "recognized as valid in this state." § 14-2-104(2).

¶87 Neither Pyfer nor LaFleur claims that he was unaware that Colorado law did not recognize same-sex marriage in 2003. To the contrary, the record reflects that each was well aware of this restriction. Consequently, whatever marriage Pyfer and LaFleur intended to enter into in 2003, one thing is for certain: It could not possibly have been a *legal* marriage. That is, as a matter of law, Pyfer and

6

LaFleur could not have intended or agreed to enter into a marital relationship recognized as legal, enforceable, and valid in Colorado.

¶88 Because the marriage Pyfer and LaFleur entered into in 2003 was not legally binding—something they both realized—there was no basis for either of them to believe that a dissolution proceeding could ever be initiated in the event the marriage failed. Nor did they have reason to think that a court could ever be called upon to distribute their assets and debts or to order either of them to pay maintenance. It follows that neither Pyfer nor LaFleur had cause to consider a prenuptial agreement or any other type of premarital arrangement to protect himself in case the marriage failed.

¶89 LaFleur, the party who owns almost all the assets in this relationship, confirms that he didn't expect there could be legal consequences if his marriage with Pyfer failed. Not only was that a reasonable expectation, it was the only rational one. Indeed, how could there be *legal* consequences vis-à-vis a dissolution proceeding as a result of entering into a marriage that was not recognized as a marriage under Colorado law and was thus devoid of legal effect? Something that's not legally binding cannot simultaneously be legally binding. In meteorological terms, it's either raining or it isn't.

¶90 The majority responds that nothing is amiss here because, following *Obergefell*, we have to treat our now-defunct constitutional and statutory

7

provisions prohibiting same-sex marriage as though they never existed. Therefore, urges the majority, there was no obstacle preventing Pyfer and LaFleur from entering into a common law marriage in 2003.

¶91 The inherent flaw in the majority's facile rationale is that it overlooks that a requirement of common law marriage is *mutual intent and agreement* to be *lawfully* married. Treating, as we must, our state law barring same-sex marriage nonexistent in 2003 does not alter the fact that Pyfer and LaFleur did not mutually intend or agree to enter into a legal marriage. Nor could they have done so—they weren't clairvoyant, and their intent and agreement could only have been based on what they knew at the time. How can two individuals mutually intend and agree to enter into a legally binding relationship when they both know that the law doesn't recognize that relationship and, in fact, deems it unlawful, unenforceable, and wholly invalid? Asked differently, how could Pyfer and LaFleur have intended and agreed to enter into a *legal* marriage when they both knew such a marriage was *illegal* in Colorado? That we must treat a certain state law in 2003 as though it never saw the light of day doesn't mean that we can somehow retroactively metamorphose Pyfer and LaFleur's mutual intent and agreement in 2003.

¶92 Alternatively, the majority argues that the Supreme Court's holding in *Obergefell* applies retroactively. But even assuming *Obergefell*'s retroactivity, it

8

doesn't obviate the Sisyphean challenge presented by the common law marriage requirement of mutual intent and agreement to enter into the *legal* relationship of marriage.[3] *Obergefell* may have changed *our state law* retroactively, but it lacks the power to change *anyone's intent* or *any couple's agreement* retroactively.

¶93 Significantly, the Supreme Court wisely predicted a quarter of a century ago that even when courts apply retroactively a new rule of law to a pending case, "they will find instances where that new rule, for well-established legal reasons, does not determine the outcome of the case." *Reynoldsville Casket Co. v. Hyde*, 514 U.S. 749, 758–59 (1995). In those instances there may be:

> (1) an alternative way of curing the constitutional violation, or (2) a previously existing, independent legal basis (having nothing to do with retroactivity) for denying relief, or (3) . . . a well-established general legal rule that trumps the new rule of law, which general rule reflects *both* reliance interests and other significant policy justifications, or (4) a principle of law, such as that of "finality" . . . , that limits the principle of retroactivity itself.

---

[3] Sisyphus was "a king in classic mythology who offended Zeus and was punished by being forced to roll an enormous boulder to the top of a steep hill. Every time the boulder neared the top, it would roll back down, and Sisyphus would have to start over." E.D. Hirsch, Jr. et al., *The Dictionary of Cultural Literacy: What Every American Needs to Know* 42 (1st ed. 1988).

*Id.* at 759.[4]  In my opinion, this case fits nicely within at least two of these categories—categories (2) and (3).

¶94    First, the mutual intent and agreement requirement is a previously existing, independent legal basis for denying relief in this case: Pyfer cannot demonstrate that he and LaFleur mutually intended and agreed to enter into the legal relationship of marriage under Colorado law prior to *Obergefell*.  *See* Colo. Const. art. 2, § 31; § 14-2-104.

¶95    Second, the general rule requiring Pyfer and LaFleur to have mutually intended and agreed to enter into the legal relationship of marriage, *see Lucero*, 747 P.2d at 663, is well-established and reflects reliance interests and other significant policy considerations.  Indeed, requiring mutual intent and agreement to enter into the legal relationship of marriage ensures that couples are on notice that legal consequences could flow from the relationship.  Without it, someone like LaFleur could unwittingly enter into a marital relationship that's explicitly deemed invalid by the law, only to find out more than a decade later when the relationship fails that he is nevertheless subject to significant legal consequences in a dissolution proceeding.  The due process concerns inherent in this type of

---

[4] The Court cautioned that "simple reliance" does not suffice to create a retroactivity exception.  *Reynoldsville Casket*, 514 U.S. at 759.

10

after-the-fact surprise cannot be brushed aside. Yet, that's precisely what the majority does. The majority dismisses LaFleur's accurate assertion that he and Pyfer could not have mutually intended or agreed to enter into a legally binding marriage because the idea of a same-sex couple entering into a lawful marriage in Colorado in 2003 was unthinkable. Maj. op. ¶ 39 n.5.

¶96 Notably, I'm not alone in thinking that the mutual intent and agreement requirement throws a monkey wrench into the majority's analysis. A panel of the Court of Appeals of South Carolina is in the same camp. Its recent decision in *Swicegood v. Thompson*, 847 S.E.2d 104 (S.C. App. 2020), is illuminating. There, as here, at the time the same-sex couple agreed to live as a married couple, both parties were aware that state law prohibited same-sex marriage. *Id.* at 113. Though the court determined that the Supreme Court's jurisprudence on retroactivity compelled "the conclusion *Obergefell* must be applied retroactively," *id.* at 110, it held that retroactive application of the decision was not dispositive, *id.* at 110–12. In so doing, the court focused in part on the mutual intent and agreement requirement of common law marriage in South Carolina:

> A party . . . must at least know that his actions will render him married as that word is commonly understood. *If a party does not comprehend that his intentions and actions will bind him in a legally binding marital relationship, then he lacks intent to be married.* The proponent of the alleged marriage has the burden of proving the elements by a preponderance of the evidence.

11

*Id.* at 113 (emphasis added) (internal quotation marks and citations omitted). Because both parties knew that South Carolina law prevented them from lawfully marrying in that state during their relationship, the court found that, as a matter of law, they "could not have formed the intent and mutual agreement to enter a legally binding marital relationship." *Id.* Therefore, they could not have been common law married during that timeframe. *Id.*

¶97 So it is here. Prior to *Obergefell*, Pyfer and LaFleur were both aware that they could not enter into the legal relationship of marriage in Colorado. Consequently, as a matter of law, they could not have mutually intended or agreed to be in a legally binding marital relationship before *Obergefell*. Pyfer and LaFleur could not have intended or agreed to enter into the legal relationship of marriage in 2003 any more than a driver with a revoked driver's license can intend to drive legally. That's true even if the law that prohibits driving with a revoked driver's license is declared unconstitutional at some point in the future and that change is applied retroactively.

¶98 Perhaps recognizing the problems inherent in retroactively imputing to Pyfer and LaFleur the required intent to be legally married when they could not have known that their marriage would subject them to any legal consequences, the majority plucks a new rule out of thin air. It declares, rather paradoxically, that, while Pyfer and LaFleur must have intended and agreed to enter into "the *legal*

12

and social *institution* of marriage," maj. op. ¶ 4 (quoting *Hogsett*, ¶ 49 ( emphases added)), they need not have intended or agreed to incur "the *legal consequences* of a marital relationship," *id.* at ¶ 39. But the majority's unprecedented and troubling approach begs the following question: How can a couple intend and agree to enter into a legal marriage without intending and agreeing to incur the legal consequences that flow from entering into such a marriage?

¶99 The majority attempts to justify its holding by speculating that "[m]any couples may not appreciate or intend the legal consequences of entering into a marital relationship, or anticipate the ways in which those consequences may shift over time as the law evolves." *Id.* However, in the same breath that it questions an average couple's awareness of the legal consequences of entering into a legal marital relationship, the majority unrealistically attributes to LaFleur knowledge of a federal court in a different state striking down a ban on same-sex marriage, and then unfairly penalizes him for failing to presciently anticipate that Colorado law would undergo a similar seismic change. *Id.* at ¶ 39 n.5. The majority cannot have its cake and eat it too.

¶100 Moreover, even assuming that not every single couple possesses "detailed knowledge of and intent to obtain all the legal consequences that attach to marriage," *Hogsett*, ¶ 54, that can hardly support the majority's incongruous conclusion. The vast majority of couples who enter into a legal marital

13

relationship appreciate and intend that some significant legal consequences will flow from that choice. Surely the majority doesn't mean to suggest that the average person is unaware that entering into a legal marriage may result in the division of marital property, lead to an award of spousal maintenance, and implicate child custody and child support issues.

¶101 In sum, I commend the majority's efforts to avoid perpetuating the exclusionary marriage regime *Obergefell* struck down. But giving effect to our common law on the mutual intent and agreement requirement in no way does so.[5] Rather, it properly guarantees that any party with exposure to a legal dissolution proceeding goes into a marital relationship with eyes wide open. If, in the event a marriage fails, someone like LaFleur may be forced to go through a legal dissolution proceeding and face consequences such as property division and spousal maintenance, we should demand that he be on notice of that up front. He's entitled to be alerted by the law that if he chooses to enter into the legal relationship of marriage, he will be subject to the legal rights, benefits, and consequences that are triggered by that choice. The majority's newly minted

---

[5] Post-*Obergefell*, same-sex couples must be allowed to enter into the lawful relationship of marriage. This includes same-sex couples who were unlawfully married pre-*Obergefell*.

14

framework robs LaFleur of that opportunity. To the extent he feels duped by the system, I can hardly blame him.

### III. Conclusion

¶102 Because I disagree with the majority that, post-*Obergefell*, a court can somehow transform a pre-*Obergefell* same-sex marital relationship in Colorado from one lacking legal effect to one that was legally binding from the moment of inception, I respectfully dissent. I would reverse and remand with instructions to return the case to the district court to determine whether the parties mutually intended and agreed to be in a *legal* marital relationship and were in a common law marriage after *Obergefell* was decided in June 2015.[6]

---

[6] The petition for marriage dissolution at the center of this appeal was filed by Pyfer in January 2018, almost two and a half years after *Obergefell* was announced.