24CA2161 Marriage of Meincke 09-04-2025

COLORADO COURT OF APPEALS

_____

Court of Appeals No. 24CA2161
Arapahoe County District Court No. 24DR30026
Honorable Frank Moschetti, Magistrate

_____

In re the Marriage of

Raymond Meincke,

Appellee,

and

Stephanie Lynn Scott,

Appellant.

_____

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE DUNN
Brown and Schock, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced September 4, 2025

_____

Griner Legal, LLC, Amy D. Griner, Lakewood, Colorado, for Appellee

Suazo Law LLC, Ian Z. Shea, Littleton, Colorado, for Appellant

¶ 1 Stephanie Scott (wife) appeals the permanent orders entered on the dissolution of her marriage to Raymond Meincke (husband). She specifically challenges the property division and allocation of decision-making responsibility. We reverse and remand for additional proceedings.

## I.  Background

¶ 2 After approximately five years of marriage and one child, husband petitioned to dissolve the parties' marriage. At the time, husband lived in his premarital home (Centennial home), and wife resided in the marital home.

¶ 3 The parties waived spousal maintenance and agreed to joint decision-making responsibility and equal parenting time. But they disputed the allocation of marital assets and debts as well as the payment of child support.

¶ 4 After an evidentiary hearing, the district court entered permanent orders. In its oral ruling, the court found that neither party was "entirely truthful about money" and that "[husband] play[ed] fast and loose with his — assets, with his actions done towards those assets." As to the marital assets and debts, the court

- awarded the marital home to wife and the Centennial home to husband;

- classified a $32,000 debt from a loan made by husband's father to wife as wife's "separate" and "non-marital" obligation;

- classified a $40,561 line of credit as wife's "separate debt"; and

- designated a $14,151 attorney fee debt as wife's separate obligation.

The court also ruled that

- the child "will continue with daycare and subsequent schooling" as "[wife] deems appropriate, consistent with the stipulations in the parenting plan"; and

- child care must be included in the child support calculation, and "[e]ither [party] may choose to do what they think is in their child's best interest. . . . [T]he $500 a month by [wife] . . . is consistent with the monthly expenses that are out there."

¶ 5      The court adopted husband's spreadsheet as the basis for its property division, except for recommended equalization payment from wife:

| Marital Asset | Marital Value | Wife's Award | Husband's Award |
|---|---|---|---|
| Marital Home | $35,836 | $35,836 | |
| Centennial Home | $138,000 | | $138,000 |
| Ford Escape | $22,004 | $22,004 | |
| Bank Accounts | $23,592 | $811 | $22,781 |
| Retirement Accounts | $314,230 | $190,227 | $124,003 |
| Debts | ($108,346) | ($33,443) | ($74,903) |
| TOTAL | $425,316 | $215,435 | $209,881 |

It then instructed husband to submit a written proposed order.

¶ 6      As directed, husband filed a proposed order. In it, he omitted the court's credibility findings, noted that his father's loan was "not a marital debt," awarded husband "all marital equity" in the Centennial home, and stated that "each party may choose their own childcare during [their] parenting time." The proposed order also awarded husband multiple Navy Federal Credit Union bank accounts and a Charles Schwab investment account that it designated as husband's "separate property with no marital value that exceed[ed] the value at the time of the marriage."

¶ 7     Without waiting for wife's response, the district court signed husband's proposed order. It then denied wife's request to set aside the order.

¶ 8     On appeal, wife contends that the district court erred (1) in classifying, valuing, and dividing the marital assets and debts; (2) by allowing each party to make their own child care decisions; and (3) by adopting husband's proposed permanent orders without first giving her an opportunity to object.

## II.     Property and Debt Division

¶ 9     Wife challenges the district court's (1) calculation of the marital value of the Centennial home; (2) classification of the loan balance, line of credit, and attorney fees as her separate debt; and (3) classification of husband's bank and investment accounts as his separate property. We address each issue in turn.

### A.     Applicable Law and Standard of Review

¶ 10    "When dividing a marital estate, a district court must first determine whether an asset or debt is marital or separate." *In re Marriage of Capparelli*, 2024 COA 103M, ¶ 9; *see* § 14-10-113(1), C.R.S. 2025. The court then must value the marital property and

4

equitably divide it, though the division need not be equal. *Capparelli*, ¶ 9; *see* § 14-10-113(1).

¶ 11    Subject to exceptions not relevant here, all property acquired during the marriage is presumed marital. *Capparelli*, ¶ 10; § 14-10-113(2)-(3). And property acquired before the marriage is separate. *In re Marriage of Wright*, 2020 COA 11, ¶ 8; *see* § 14-10-113(4). The spouse claiming that property is not marital bears the burden of proving that the property retained its separate character. *In re Marriage of Smith*, 2024 COA 95, ¶ 41.

¶ 12    The classification of property as marital or separate is a legal determination based on the district court's factual findings. *Capparelli*, ¶ 8. While we defer to the court's factual findings, we review its legal determinations de novo. *Id.*

¶ 13    The district court "has broad discretion to determine an equitable division of the marital assets and debts." *Id.* at ¶ 7. We won't disturb that division absent an abuse of discretion "that, when viewed in relation to the property division as a whole, 'affects the substantial rights of the parties.'" *LaFleur v. Pyfer*, 2021 CO 3, ¶ 61 (quoting *In re Marriage of Balanson*, 25 P.3d 28, 36 (Colo.

2001)). The court abuses its discretion when it misapplies the law. *Smith*, ¶ 65.

### B.   Centennial Home

¶ 14   It's undisputed that the Centennial home is husband's separate property. At the time of the marriage, husband used the Centennial home as a rental property. It was valued at $390,000 with a $378,179 mortgage, leaving $11,821 in equity. Wife testified that the parties paid the mortgage with a combination of the rental income and marital funds. By the time of the permanent orders hearing, the home was valued at $528,000 and the mortgage had dropped to $329,337, increasing the equity to $198,663. Thus, during the marriage, the Centennial home's equity increased by $186,842.[1]

¶ 15   The district court did not consider the equity increase. Instead, it found that the marital value of the Centennial home was $138,000 based on the difference in the property's market value on the date of the marriage ($390,000) and on the date of the hearing ($528,000).

---

[1] Subtracting $11,821 (equity at the time of the marriage) from $198,663 (equity at the time of the hearing) equals $186,842.

¶ 16    By doing that, the court erred. That's because when marital funds reduce debt on separate property — as happened here — the resulting equity increase is marital property. *See In re Marriage of Cardona*, 321 P.3d 518, 522 (Colo. App. 2010) (concluding that rental income used to pay down the mortgage was marital income), *aff'd on other grounds*, 2014 CO 3; *see also In re Marriage of Burford*, 26 P.3d 550, 558 (Colo. App. 2001) (noting that equity from use of marital funds to pay off separate debts must be considered in property division). The court therefore erred by failing to account for the $186,842 of marital equity in the Centennial home.

## C.    Husband's Father Loan

¶ 17    Husband testified that during the marriage, his father loaned wife $50,000 to cover "therapeutic care" for her child from a previous relationship. Husband's father deposited the funds into a joint account that he shared with husband. Husband then withdrew $35,000 and paid off marital credit cards that had been used to pay for the therapeutic care. Wife repaid husband's father $18,000, leaving a $32,000 loan balance. Husband's father later filed an action against wife for breach of contract, and, in turn, she

impleaded husband as a third-party defendant.  That lawsuit was pending at the time of the permanent orders hearing.

¶ 18 Because it was the subject of a pending civil suit, the district court classified the $32,000 loan balance as wife's separate debt.

¶ 19 Because the loan was incurred during the marriage, however, the debt was presumptively marital.  *See Capparelli*, ¶¶ 10, 18; *see also In re Marriage of Morton*, 2016 COA 1, ¶ 6 (student loans incurred during marriage were marital debt).  The district court cited no legal authority — and we're aware of none — that says the presumption of marital debt may be overcome when that debt becomes the subject of a separate civil action.  *See In re Marriage of Blaine*, 2021 CO 13, ¶ 3 ("[A] party may overcome the marital property presumption . . . only through the four statutory exceptions set forth in section 14-10-113(2).").  And the district court didn't find — and husband doesn't argue — that the debt fell under any of the statutory exceptions.  *See* § 14-10-113(3); *Smith*, ¶ 41.

¶ 20 For that reason, the district court erred by classifying the $32,000 loan balance as wife's separate debt.

## D. Line of Credit

¶ 21 Wife took out a $50,000 line of credit shortly after husband filed for divorce, using it to finish the basement in the marital home. Due in part to that improvement, the home's appraised value increased from $521,000 to $547,000. At the hearing, the line of credit had a $40,561 balance.

¶ 22 Husband asserted that the remaining debt was wife's alone because she had opened the line of credit without informing him and did not share the funds with him.

¶ 23 The district court accepted the $547,000 valuation of the marital home but determined that the $40,561 line of credit was wife's separate obligation.

¶ 24 The line of credit arose during the marriage (and was used to enhance the value of the marital home), triggering the presumption of marital debt. *See Capparelli*, ¶¶ 10, 18. Husband points to no evidence rebutting that presumption, nor does he argue that the debt falls within a statutory exception. *See* § 14-10-113(3); *Smith*, ¶ 41. The district court therefore erred by excluding the $40,561 line of credit from the marital estate.

## E. Attorney Fees

¶ 25    During the marriage, wife incurred attorney fees in a custody dispute against the father of her other children.  Husband said that the outstanding $14,151 in fees should be classified as wife's separate debt because it did not "advance the marriage."  Wife testified that, although the custody dispute started before the marriage, husband was aware of the ongoing proceedings, and she had "paid those litigation expenses that predated the marriage prior to the marriage."[2]

¶ 26    The district court classified the $14,151 debt as wife's separate obligation.  But again, because the attorney fees were incurred during the marriage and the court found no statutory exception, the debt was presumptively marital. *See* § 14-10-113(3); *Capparelli*, ¶¶ 10, 18; *Smith*, ¶ 41.  Thus, the court erred by classifying the fees as wife's separate debt.

---

[2] A stipulated invoice exhibit submitted before the permanent orders hearing corroborates wife's testimony that the attorney fees stemmed from work done during the marriage.  The invoice also shows a $5,000 "[c]lient [d]iscount," reducing the attorney fees debt from $14,151 to $9,151.  However, neither party addresses the invoice on appeal, and it's unclear whether the invoice was admitted during the hearing or otherwise considered by the district court.

### F. Bank and Investment Accounts

¶ 27    At the hearing, husband maintained that the following premarital bank and investment accounts remained his separate property:

| Institution | Type | Value at Marriage | Value at Permanent Orders Hearing |
|---|---|---|---|
| Navy Federal Credit Union | Checking #4721 | $16,227 | $3,804 |
| Navy Federal Credit Union | Savings #4200 | $111 | $55 |
| Charles Schwab | Brokerage #5721 | $71,865 | $31,000 |

And he testified that the balances had not appreciated since the marriage.

¶ 28    But husband acknowledged that $71,929 from the sale of the parties' Florida home, which had been held in their joint account, was deposited into his checking account.  He also admitted that he transferred $15,000 in marital funds from his checking account into a TD Ameritrade account.  Moreover, husband's checking account was jointly titled with his father, who deposited the loan to wife into that account.

11

¶ 29    Regarding the savings account, husband testified that he was not sure whether marital funds had been contributed.

¶ 30    As for the brokerage account, husband admitted that he actively traded from it during the marriage. He testified that he deposited $2,229 from unspecified "outside accounts" in 2021; another $6,200 from "outside accounts" in 2022; and $20,400 in "marital money" in 2023. He also indicated that some of the brokerage account helped finance marital real estate, which was later "rolled into" the Florida home purchase.

¶ 31    Despite this evidence, the district court adopted husband's asset spreadsheet and proposed permanent orders awarding the three accounts to husband as his separate property. The court did not address tracing, commingling, or appreciation. *See In re Marriage of Corak*, 2014 COA 147, ¶ 11 (to remain separate, premarital property that has been comingled with marital property must be traced back to its separate form); *see also Capparelli*, ¶ 11 (separate property placed in joint ownership during the marriage is presumed marital); *Wright*, ¶ 8 (the increase in value of separate property during marriage is marital property subject to division). Nor did the court consider third-party contributions to the checking

12

account.  Each of those issues involves fact-intensive inquiries that demand specific findings.  *See LaFleur,* ¶¶ 64-65 (reversing property division because appellate court could not determine whether premarital assets and debts were separate or marital property); *In re Marriage of Seewald,* 22 P.3d 580, 586 (Colo. App. 2001) (reversing property division because appellate court could not determine whether the husband's assets had been commingled or whether the assets had appreciated during the marriage and should have been included in the marital estate).

¶ 32     Without such findings, we are unable to determine whether husband's accounts are marital or separate property.  *See Wright,* ¶ 20 (district court must make sufficient findings to permit meaningful appellate review).  We therefore must reverse the district court's determination that the Navy Federal Credit Union bank accounts and the Charles Schwab investment account were husband's separate property.

## G.    The Errors Require Reversal

¶ 33     Collectively, the district court's errors impacted "a large percentage of the marital estate" (which totaled over $1.2 million) and thus affected the parties' substantial rights.  *Balanson,* 25 P.3d

at 36; *see* C.R.C.P. 61.  We therefore must reverse and remand the court's property division for reconsideration.  *See Balanson*, 25 P.3d at 36; *In re Marriage of Zappanti*, 80 P.3d 889, 894 (Colo. App. 2003) (remanding for new property division after the district court failed to account for and divide $200,000 of marital property).

### III.   Decision-Making Responsibility

¶ 34    Wife next takes issue with the portion of the permanent orders stating that "each party may choose their own childcare during his or her parenting time."  She contends that order is inconsistent with the court's oral ruling.  We conclude that further findings are necessary.

¶ 35    The parenting plan states that "[e]ach party may select daycare providers, babysitters or other such providers" for the child during their respective parenting times.

¶ 36    At the hearing, husband testified that his mother provided free child care during his parenting time.  And in calculating the appropriate child care expenses to be included on the child support worksheet, husband wanted each party to choose and pay for their own child care.  By contrast, wife asked that she remain responsible for arranging and paying $560 per month for after-

14

school care and summer camp.  She testified that her daycare provider was "better for" the child because it was close to the child's school and the child had many friends there.

¶ 37    The district court adopted the parties' parenting plan and orally ruled both that wife would continue to manage the child's "daycare and subsequent schooling" and that "[e]ither parent may choose to do what they think is in their child's best interest."  The court added $560 a month to the child support worksheet.  The written permanent orders state that "each party may choose their own childcare" during their respective parenting time.

¶ 38    Because there are inconsistencies between the oral and written permanent orders, we are unable to determine from this record whether the court adopted the parenting plan — which allows each party to select child care during their respective parenting time — or intended something else.  To the extent the court meant to deviate from the parenting plan, the permanent orders do not contain any finding that such a deviation was in the child's best interests.  Additionally, to the extent the court intended to allow each party to choose their own child care, the child support calculation — which is based on wife paying for "full time" child

15

care — doesn't reflect that intent. Both inconsistencies require clarification on remand. *See Wright*, ¶ 20.

IV.   Remand Instructions

¶ 39    We reverse the district court's property division and direct the court to reexamine the entire property division.[3] *See Capparelli*, ¶ 26. In doing so, the court must (1) recalculate the Centennial home's marital value to account for the $186,842 increase in equity, *see Cardona*, 321 P.3d at 522; (2) reclassify the loan, line of credit, and attorney fees as marital debts, *see Capparelli*, ¶ 26; and (3) make findings on whether husband's bank and investment accounts retained their separate character, *see LaFleur*, ¶¶ 64-65; *Wright*, ¶ 20.

¶ 40    Except for the Centennial home's recalculated equity, the district court must use the same property and debt valuations from the permanent orders. *See Capparelli*, ¶ 26; § 14-10-113(5). The court must examine the asset and debt divisions based on the

---

[3] Because we are reversing the entire property division, we needn't consider wife's contention that the district court erred by signing husband's proposed permanent orders without first giving her a fair opportunity to object or suggest changes. *See* C.R.C.P. 121, § 1-16(1) (allowing a party seven days to object to a proposed order).

parties' current circumstances, *see Capparelli*, ¶ 26; § 14-10-113(1)(c), and the court may take additional evidence as it deems necessary, *see Corak*, ¶ 21. While the division must be equitable, we express no opinion on how the court should divide the marital assets and debts. *See Capparelli*, ¶¶ 9, 18; § 14-10-113(1).

¶ 41    Because we're reversing the property division, we also reverse the portion of the permanent orders addressing child support. *See In re Marriage of Singewald*, 535 P.2d 252, 254 (Colo. App. 1975) (not published pursuant to C.A.R. 35(f)) (reversing maintenance and child support awards because they were "inextricably intertwined" with an erroneous property division); *cf. In re Marriage of de Koning*, 2016 CO 2, ¶ 26 (collecting cases requiring the district court to reevaluate maintenance and attorney fees awards in light of an updated property division because "the issues are interdependent").

¶ 42    Finally, the district court should clarify whether the parties can choose their own child care and factor that determination into its child support calculation. When appropriate, the court should make specific findings that its child care determination is in the child's best interests.

## V.    Disposition

¶ 43    We reverse the portions of the permanent orders involving the property division, child support, and decision-making responsibility, and we remand the case for additional proceedings consistent with this opinion.

JUDGE BROWN and JUDGE SCHOCK concur.